In re Robert L. TODD, Debtor.

Robert L. TODD, Plaintiff,

v.

RAILROAD FEDERAL CREDIT UNION, Defendant.

Bankruptcy No. 94–05656–BGC–13.
Adv. No. 94–00329.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

March 30, 1995.

Oscar Adams, III, Birmingham, AL, for plaintiff-debtor.

Joseph Bulgarella, Key, Frawley & Bulgarella, Birmingham, AL, for defendant.

David P. Rogers, Jr., Chapter 13 Standing Trustee.

## OPINION AND ORDER SUSTAINING OBJECTION TO CONFIRMATION

### (Filed by Railroad Federal Credit Union)

BENJAMIN COHEN, Bankruptcy Judge.

The matters before this Court are:

1. A Complaint to Set Aside Foreclosure and Reinstate Mortgage;

2. A Preliminary Hearing on Motion for Relief from Stay filed by Railroad Federal Credit Union;

3. An Objection to Confirmation filed by Railroad Federal Credit Union; and,

4. A Hearing on Confirmation of Plan.

After notice, a hearing was held on January 5, 1995. Robert Todd, the Plaintiff-Debtor, Oscar Adams, III, the attorney for the Plaintiff-Debtor, Joe Bulgarella, the attorney for the Defendant, Doug Watson, a representative of the Railroad Federal Credit Union, and David P. Rogers, Jr., Chapter 13 Standing Trustee, appeared. All matters were submitted on the testimony of both the Debtor and Mr. Watson and on numerous exhibits.

## I. Contentions

In the Complaint to Set Aside Foreclosure and Reinstate Mortgage the Debtor asks the Court to set aside a September 16, 1994, mortgage foreclosure and to reinstate the mortgage the Debtor entered into with the Railroad Federal Credit Union. In its answer and in its Motion for Relief from Stay, the Credit Union contends that the Debtor does not have any interest in the subject property which could be reinstated and asks the Court to grant it relief from the automatic stay to allow it to proceed against that property. In its Objection to Confirmation, the Credit Union contends that the Debtor's proposed plan of reorganization is not feasible and was not proposed in good faith and therefore may not be confirmed pursuant to 11 U.S.C. § 1325(a).[1]

## II. Procedure

The matters before this Court should be bifurcated. One part relates to confirmation of the Debtor's plan and another relates to the relief from stay and the mortgage fore-

---

1. 11 U.S.C. § 1325(a) reads:
   (a) Except as provided in subsection (b), the court shall confirm a plan if—
   (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
   (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
   (3) the plan has been proposed in good faith and not by any means forbidden by law;
   (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
   (5) with respect to each allowed secured claim provided for by the plan—

   (A) the holder of such claim has accepted the plan;
   (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
   (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
   (C) the debtor surrenders the property securing such claim to such holder; and
   (6) the debtor will be able to make all payments under the plan and to comply with the plan.
   There is no contention that subparagraphs (1), (2), (4) and (5) are not satisfied. The issues before this Court concern subparagraphs (3) and (6) only.

closure. At trial, the Court stated it would first consider the feasibility of the Debtor's proposed plan and would then consider what interest the Debtor retained in the property subject to the complaint and the motion for relief.

The Court considers the evidence submitted and the testimony taken as applicable to all matters, however, the Court and the parties agreed that if the Court found that the proposed plan was not feasible or not filed in good faith, that there would then be no need to consider the remaining issues. What the Court and the parties did not consider was that if the plan were not feasible, in all likelihood the Debtor's inability to pay both his direct current mortgage payments and his plan payments, would be the cause. Because of the Court's ruling in this order, that is in fact the resulting situation. The Debtor is trapped. He must choose an infeasible plan designed to save his home or a feasible plan that offers no protection for the property. If this Court had foreseen this possibility, it would have suggested that the Court first determine the extent of the Debtor's interest in the property. It did not, and to do so now would be unfair to the parties; consequently, this opinion and order do not address either the Complaint to Set Aside Foreclosure and Reinstate Mortgage or the Motion for Relief from Stay. The present issues before the Court relate solely to the confirmation of the Debtor's proposed plan.

### III. Confirmation

Railroad Federal Credit Union questions whether the Debtor's plan is feasible and whether the plan was proposed in good faith. For the reasons stated below this Court finds that although the plan was proposed in good faith, it is not feasible.

2. If this Court subsequently finds that the Debtor no longer has an interest in this property, any issues relating to mortgages are of course moot.

3. Attorneys for both parties met with the Court in chambers on March 15, 1995, to assist the Court in reconciling the mortgage balances and arrearage balances on those mortgages. The Court has substituted the March 15, 1995, amounts for those from the trial record.

4. The Debtor testified that the home was valued at $167,000.00 according to the last appraisal

### A. Findings of Fact

The Debtor occupies a home that was subject to a foreclosure sale by the Railroad Federal Credit Union on September 16, 1994. At that sale the Credit Union was the successful, and only bidder, at $20,238.90, the arrearage amount due the mortgagee by the Debtor. A mortgage foreclosure deed was recorded in the Shelby County, Alabama Probate Court on September 16, 1994, and a letter dated September 16, 1994, was sent to the Debtor by certified mail advising him of the foreclosure and demanding possession of the property. The Debtor did not move and continues to occupy the property.

There were, and still are, two existing mortgages.[2] The first, for $92,893.92 is to the U.S. Department of Housing and Urban Development (HUD) and a second, for $19,225.82 is to the Railroad Federal Credit Union.[3] The amount owed to HUD is $13,853.99 less than the amount due before the foreclosure sale. Because the Credit Union was the second mortgagee, it paid the first mortgagee, HUD, that amount to satisfy HUD's arrearage claim against the property. The Credit Union's claim before this Court includes that amount along with a post-petition arrearage of $20,742.00. An additional arrearage amount of $5,313.88 is due HUD. The current value of the home is $167,000.00.[4] The Debtor's equity is therefore approximately $28,825.00.

If the Debtor has an interest in the property, his current monthly mortgage payments would be $892.00 to HUD and $400.00 to the Credit Union. After the foreclosure the Credit Union began making the $892.00 monthly payment to HUD and continues to make that first mortgage payment.[5]

performed. There was no other value evidence presented.

5. There is disagreement over the amount of the HUD mortgage payments. The Debtor testified that HUD, through a "consignment program" that allows FHA home buyers to modify monthly mortgage payments on a temporary basis, reduced his payments from $892.00 per month to $477.00 per month. The Debtor maintains that this reduction is still in effect. This temporary reduction for assistance purposes did not however affect the Credit Union which was still required to make the full payment to HUD, includ-

The Debtor has been a licensed realtor since 1982, however, he was until 1992 employed by Norfolk Southern Railroad for 20 years, 16 of those as a locomotive engineer. Mr. Todd left Norfolk after he was diagnosed as having cancer. He received treatment for the illness which is in remission. When Mr. Todd separated from Norfolk, the railroad paid him, after taxes and insurance deductions, approximately $76,000.00. Because of his illness, Mr. Todd had been unable to work in a substantial capacity since 1991. After he received the separation amount from Norfolk he used those funds to pay debts that accumulated during his illness.

The Debtor is currently a real estate agent whose income is based solely on commissions from sales.[6] He is currently an independent contractor with CHF Realty. In his bankruptcy petition the Debtor estimated his income before deductions as $3,200.00 per month with net income of $2,400.00.[7] The Debtor estimated his monthly expenses as $1,562.00 which included $900.00 per month in mortgage payments.[8] For purposes of feasibility the facts before this Court are that ing all arrearage amounts. Consequently any benefit the Debtor enjoyed from the reduction is completely offset by his responsibility to repay the Credit Union. This Court finds that the correct mortgage payments for purposes of determining feasibility is the full amount of $1,292.00. The Debtor at some time will be required to make the full payment. In the meantime, if the Debtor does not make the full payment, the arrearage amount he owes the mortgagees will continue to increase. Even if the reduction continued, all agree that it would not continue for the life of the Chapter 13 plan.

6. Estimating future income is similar to attempting to determine "regular income" for purposes of section 109(e) of the Bankruptcy Code. In describing the later this Court wrote:

Section 109(e) of the Bankruptcy Code allows only "an individual with regular income" to file a Chapter 13 petition. 11 U.S.C. § 109(e). "An individual with regular income" is defined in Section 101(30) of the Code as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under Chapter 13...." 11 U.S.C. § 101(30). Mr. Self [the creditor] argues that the Debtor does not meet this criteria. The Debtor's Chapter 13 schedules list the Debtor's occupation as "construction supervisor." His total net monthly income is $1,376.22. His total monthly expenses are $1,174.00. The Debtor reports disposable income of approximately $200.00 per month. This Court finds that an individual who works as a "construction supervisor" with a net monthly income of $1,376.22 is an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under Chapter 13." The Court of Appeals for the Eleventh Circuit has stated that the purpose of the modification of the Bankruptcy Code to allow any individual with regular income to file a Chapter 13 petition was to, "permit almost any individual with regular income to propose and to have approved a reasonable plan for debt repayment based on that individual's exact circumstances." *United States v. Devall*, 704 F.2d 1513, 1515–1516 (11th Cir.1983) (citing S.Rep. No. 95–989, at 13, 1978 U.S.Code Cong. & Ad.News at 5799) *reh'g denied*, 714 F.2d 1068 (11th Cir.1983) (reemphasized in *In re Hammonds*, 729 F.2d 1391 (11th Cir.1984)) where it held that local public assistance benefits were regular income).

It is difficult, if not impossible, for a court to substantiate a finding that an individual has regular, stable income, just because that individual has a particular occupation; however, one must assume that all courts would consider that certain occupations, such as attorneys, would have such income. Given this presumption and knowing first hand the experiences of a sole practitioner in a private law practice, common sense tells this Court that if attorneys *do* qualify, then most, if not all occupations qualify as well.

*In re Griggs*, 181 B.R. 111 (Bankr.N.D.Ala.1994) (parenthetical added).

7. The Debtor testified that he computed his income at $3,200.00 per month rather than a lower figure because at the time he filed his petition he had outstanding projects that he believed would generate commissions for him. At the time of trial those projects were still pending.

8. The Debtor may have intended the $900.00 listing to represent his mortgage payment to HUD only, or it could have represented the total of both payments. Because the Debtor believed that his HUD payment was reduced by approximately the amount of his second mortgage payment, when the first and second payments are added together, the total is close to the amount of the first payment. On direct examination the Debtor testified that the $900.00 amount was for the first mortgage and did not represent any payment for the Credit Union mortgage. On cross examination the Debtor testified that his reduced payment to HUD was $477.00 per month and his payment to the Credit Union was $400.00 per month. Added together the total would be $877.00. The parties could never agree on what the $900.00 listing represented. But as stated above, the Court finds, that for the purposes of feasibility, the amount due in mortgage payments is $1,292.00.

the Debtor projects his gross income to be $3,200.00 per month with $2,400.00 net income. His mortgage payments would total approximately $1,300.00 per month, his other expenses will total approximately $660.00 per month and his payments to the Chapter 13 Trustee will be approximately $1,100.00 per month.[9]

The Debtor's income from commissions from January 31, 1994 through November 10, 1994 was approximately $24,708.00. On a monthly basis his average income was approximately $2,050.00. The Debtor's actual income, in rounded figures, was for January $683.00, February $3,546.00, March, none, April $1,972.00, May $1,250.00, June $1,027.00, July $1,215, August $944.00, September $8,428.00 and for October $4,588.00.

In November 1993 both the Debtor's car and truck were repossessed. From November 1993 to April 1994 the Debtor was without personal transportation. He purchased another car in April 1994, which he continues to use.

Mr. Todd divorced in April 1994; however, he and his former wife share their former residence, the residence that is the subject of complaint and motion for relief pending before this Court. The Debtor testified that the couple's divorce decree required the Debtor to pay $15,000 to his wife for her portion of the equity of their house. The Debtor has been unable to make that payment. Their living arrangement is a temporary substitute for that payment.[10]

Since filing this case on September 23, 1994, the Debtor has made regular plan payments of $838.00 per month to the Chapter 13 Trustee for October, November, December and January. The Debtor believes that he will be able to continue making regular payments even if those payments are increased to $1,100.00 per month. On March 15, 1995, the Credit Union filed a motion to dismiss the Debtor's case contending that no plan payments have been made since January 1995. That motion is scheduled for hearing for April 10, 1995.

## B. Conclusions of Law

### 1. Good Faith

■ The first issue before this Court, as framed by section 1325(a)(3), is whether, "the plan has been proposed in good faith...." 11 U.S.C. § 1325(a)(3). In *In re Kitchens*, 702 F.2d 885 (11th Cir.1983), the Court of Appeals for the Eleventh Circuit discussed previously recognized "best interests" and "best efforts" tests used to determine good faith, and although not specifically adopting, as other circuit courts have, a "middle road between the 'best interests' and 'best efforts' tests", *id.* at 888, the court recognized many of the same factors the other circuit courts have adopted as guidance to bankruptcy courts in determining whether a plan has been proposed in good faith.[11] This Court

9. Total expenses were estimated at $1,562.00 per month. The $660.00 amount is the rounded off difference in $1,562 and the estimated mortgage payment of $900.00.

10. The Debtor's former wife filed a Chapter 7 bankruptcy petition in this court on November 7, 1994 under the name of Shearrod A. McMillian. That case, No. 94–06700–BGC–7, is pending as of the date of this order.

11. Those factors include:
(1) the amount of the debtor's income from all sources;
(2) the living expenses of the debtor and his dependents;
(3) the amount of attorney's fee;
(4) the probable or expected duration of the debtor's Chapter 13 plan;
(5) the motivations of the debtor and his sincerity if seeking relief under the provisions of Chapter 13;
(6) the debtor's degree of effort;

(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;
(8) special circumstances such as inordinate medical expense;
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;
(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors (the extent to which claims are modified and the extent of preferential treatment among classes of creditors);
(11) the burden which the plan's administration would place on the trustee;
(12) substantiality of the repayment to the unsecured creditors;
(13) consideration of the type of debt to be discharged and whether such debt would be nondischargeable;
(14) the accuracy of the plan's debts and expenses and whether any inaccuracies are an attempt to mislead the court.
*Kitchens* at 888–89.

has considered those factors in this case.[12]

In a subsequent case the circuit court recounted the history of "good faith" discussions and found that those discussions were applicable to section 1325(a)(3). The *per curiam* opinion in *In re Waldron,* 785 F.2d 936 (11th Cir.1986) reads:

> While it is difficult to discern the congressional intent behind section 1325(a)(3) because of a dearth of legislative history, the term "good faith" is certainly not new to bankruptcy law. Section 141 of the Bankruptcy Act of 1898, 11 U.S.C.A. § 541 (West 1979) (repealed 1979), required that a Chapter X petition for corporate reorganization be filed in good faith or face dismissal. Section 146 of the Act, 11 U.S.C.A. § 546 (West 1979) (repealed 1979), set forth four specific criteria of the term "good faith" but emphasized that the meaning of the term was not to be limited by these four tests. Cases interpreting sections 141 and 146 have therefore defined good faith broadly:
>
> > Basically, the general elements of good faith, undefined in the statute, mean that the petition must be filed with the honest intent and genuine desire to utilize the provision of Chapter X for its intended purpose—to effectuate a corporate reorganization—and not merely as a device to serve some sinister and unworthy

purpose of the petitioner.... The court cannot and will not tolerate such misuse of the reorganization process.

> > *In re Southern Land Title Corp.,* 301 F.Supp. 379, 428 (E.D.La.1968) (emphasis added). See also *Mongiello Brothers Coal Corp. v. Houghtaling Properties, Inc.,* 309 F.2d 925, 930 (5th Cir.1962) ("[i]n considering the presence or absence of good faith, it must be borne in mind that the Act is not to be abused by the extension of its privileges to those not within the contemplation of it...."). These discussions are equally applicable to the good faith provision in Chapter 13. See *In re Leal,* 7 B.R. 245, 247 (Bankr.D.Colo.1980).

*Id.* at 939.[13]

▪ In this case, the Court finds that the totality of the facts demonstrate that the Debtor's plan was filed in good faith. This case is the Debtor's first Chapter 13 case. He proposes to pay all of his unsecured creditors in full and had, through the date of trial, made all required indirect payments to the Chapter 13 Trustee. Until the arrearage claims of HUD and the Credit Union increased beyond the Debtor's ability to pay, his proposed plan would have been feasible. His income is substantial and his living expenses are not excessive. He simply cannot afford to make the payments required to pay the debts associated with his home.

**12.** The circuit court does not suggest that one factor outweighs any other or that the bankruptcy courts should create a tally sheet to arrive at a majority rules result. And in *In re Saylors,* 869 F.2d 1434 (11th Cir.1989) the court implied that the satisfaction of only one factor was sufficient for a bankruptcy court to find good faith. Judge Robert S. Vance, writing for the court, said:

> In *In re Kitchens,* 702 F.2d 885, 888–89 (11th Cir.1983), we enumerated a nonexclusive list of factors that a bankruptcy court should consider in making a determination of good faith. In the present case, the bankruptcy court expressly stated that it considered these factors in determining that Saylors proposed his plan in good faith. The court found that at least one of the factors favoring a conclusion of good faith was present—Saylor's monthly income had increased between the filing of his chapter 7 petition and the filing of his chapter 13 petition. While the two factors noted by the district court also were of concern, their appropriate weight largely dependent on the

credibility of the debtor. The bankruptcy court was in the best position to judge this credibility. The record does not support a holding that the bankruptcy court's finding was clearly erroneous.

*Id.* at 1438. Because a "bankruptcy court's determination whether a chapter 13 plan has been proposed in good faith is a finding of fact ..." *id.,* this Court considered not only the factors Judge Vance described, but also the many factors which all courts must consider in evaluating the facts before them.

**13.** In *In re Fawcett,* 758 F.2d 588 (11th Cir.1985) Judge Thomas A. Clark, writing for the court, said, "As noted by the Second Circuit in *In re Johnson,* 708 F.2d 865 (2d Cir.1983): ' "Good faith," while not defined by statute or legislative history, ... certainly does, however, require "honesty of intention," ... in the sense of focusing on the debtor's conduct in the submission, approval and implementation of a Chapter 13 bankruptcy plan.' Id. at 868 (citations omitted) (emphasis added)." *Id.* at 590–91.

This Debtor's life has changed significantly over the last year. He has found a solution to what ever caused his domestic problems. The outlook for good health is considerably better now that his illness is in remission. He has reliable transportation, which in the realty business is without question absolutely necessary. The overall structure, organization and stability of the Debtor's life seems at this point to be secure. This Court finds, in light of these changes that the Debtor's estimation of his future income is reasonable. He has already demonstrated that he is capable of generating monthly income in excess of $3,200.00 and has demonstrated that he is focused and is attentive to his business, two characteristics which are required for success in the realty business.

Based on the above, this Court finds that the Debtor's plan was proposed in good faith and that the Debtor has satisfied the requirements of section 1325(a)(3).

### 2. Feasibility

The second issue before this Court, as framed by section 1325(a)(6), is whether "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6).

Although the Court of Appeals for the Eleventh Circuit has not issued a direct opinion on feasibility of a plan, the court has considered the issue generally. In considering whether Social Security benefits (*United States v. Devall*, 704 F.2d 1513 (11th Cir. 1983)) and whether Aid to Families With Dependent Children benefits (*In re Hammonds*, 729 F.2d 1391 (11th Cir.1984)) may be used to fund a Chapter 13 plan, the court recognized:

A debtor in a Chapter 13 case who chooses to provide for repayment of his debts from his Social Security benefits is unlike an ordinary assignor in several respects. First, the plan of debt adjustment must be reviewed and approved by a United States Bankruptcy Judge. In approving the plan, the Court must determine that the debtor will be able to make all payments under the plan and to comply with the plan. 11 U.S.C. § 1325(a)(6). The Court will not approve a plan unless it is clear that the debtor will be able to make these payments, thus perhaps enabling him to retain property which would otherwise be subject to the claims of creditors. Unless the Court has first ascertained that the plan of repayment is feasible and will work no undue hardship on the debtor or his dependents, the plan cannot be confirmed. Second, and perhaps more importantly, Chapter 13 is a wholly voluntary proceeding. A debtor cannot be forced to submit his Social Security benefits to the jurisdiction of the Court. See 11 U.S.C. §§ 303(a), 706(c), 1112(d). Moreover, a debtor under Chapter 13 has a non-waivable right to dismiss his case under Chapter 13. For this reason the debtor's benefits may not be subject to seizure in any legal process against the debtor unless and except to the extent that he so desires.

*In re Hammond*, 729 F.2d 1391, 1394–1395 (11th Cir.1984) (citations omitted) (quoting *United States v. Devall*, 704 F.2d at 1517 (quoting *In re Penland*, 11 B.R. 522 (Bkrtcy. N.D.Ga.1981))).

The Court explained further:

The supervision of the bankruptcy judge, who must insure that the payment plan is feasible given the needs of the individual debtor, is a safeguard against a voluntary chapter 13 plan operating to the detriment of the debtor's children. See *In re Shebel*, 22 B.R. 9 (Bkrtcy.D.Vt.1982) (even though AFDC benefits are income, the bankruptcy judge rejected the chapter 13 plan because the payment schedule was not feasible given the needs of debtor's dependents).

*Id.* at 1395.

The tone of the court's instructions is certainly affected by the assistance nature of Social Security and AFDC benefits; however, the general principles apply to the instant case. These include:

1. Whether the debtor will be able to make all payments under the plan;

2. Whether the debtor will be able to comply with the plan;

3. Whether the debtor will be able to retain property that would otherwise be subject to claims of creditors;

4. Whether the Chapter 13 proceeding remains wholly voluntary; and,

5. Whether the plan of repayment works any undue hardship on the debtor or his dependents.

■■ Whether a debtor's plan is feasible is a factual question. As an amended plan of reorganization, this Debtor proposes to increase his non-direct plan payments from $838.00 to $1,100.00. This proposal is based on the Debtor's estimation of future income, which in turn is based on past income and changed circumstances. The immediate question before this Court is whether the Debtor's estimation is reasonable. Based on the evidence, this Court finds that the estimation is reasonable. As stated, the Debtor's life has changed significantly. He has reliable transportation, his health is good, his domestic situation is improving and he is focused in his work. This Court believes that the Debtor should be able to generate the income he expects. However, even with an income of $3,200.00 per month, in considering all of the Debtor's expenses as he estimates them, this Court cannot find that the plan, as proposed, is feasible.[14]

Gross income of $3,200.00 per month, with net income of $2,400.00, will not fund the Debtor's proposed plan. His direct mortgage payments, if he has an interest in the property subject to this matter, will be approximately $1,300.00 per month. His current payments to the Chapter 13 Trustee, although set at $838.00, must be increased to at least $1,100.00 because of the increased post-petition mortgage arrearage claims.[15] In determining that the Debtor's plan is not feasible this Court finds that:

1. The Debtor will not be able to make all payments under the plan. The Debtor's projected net monthly income is $2,400.00. His projected post-petition monthly expenses are: $660.00 for current ordinary expenses; and, $1,300.00 for mortgage payments. Total expenses are $1,960.00. Subtracting current expenses from net income, the Debtor's excess income is $440.00 per month. His direct plan payments, to pay pre-petition debts, will be approximately $1,100.00 per month, some $660.00 greater than his net income, or the amount of his living expenses;[16]

2. The Debtor will not be able to comply with the plan even if he continues to work. Unless his expenses decrease or his income increases the plan is not workable;

3. Whether the Debtor will be able to retain his home if he does not continue with this Chapter 13 proceeding is a question relating to the Debtor's post-foreclosure interest in the property and is not one necessary to answer here;

4. The Chapter 13 proceeding will remain wholly voluntary. The Debtor will not be required to remain in this proceeding unless he chooses; however,

5. The Debtor's plan of repayment, will work an undue hardship on the Debtor and his dependent. If the Debtor's net income is approximately $2,400 per month and his direct and indirect plan payments are approximately $2,400, he has no money for ordinary living expenses. Of the approximate $660.00

---

14. This Court does not consider the process of deciding whether "the debtor will be able to make all payments under the plan" simply an arithmetical one. Witnesses' credibility and similar factual considerations are always important. In this case the Debtor's testimony bolstered his positions.

15. Where debtors propose to add arrearage claims in postconfirmation situations, the Court of Appeals for the Eleventh Circuit instructs that, "a judicial inquiry should be undertaken to determine whether a proposed modification to cure a default will comport with § 1322(b)(5)'s requirements that such a cure be effected within a reasonable time and simultaneously maintain payments on the long term loan." *In re Hoggle*, 12 F.3d 1008, 1012 (11th Cir.1994). The Debtor

here is in a similar situation. He needs to pay his current mortgage payments along with substantial post-petition arrearage claims. If this Court is permitted to analogize this situation to *Hoggle*, this Debtor will not be able to pay simultaneously his long term loan mortgage debts and the arrearage claims from those mortgages.

16. Even if the Debtor were allowed to pay his HUD mortgage payment at $477.00 per month rather than the full $892.00 amount, his net income would be $245.00 less than required to fund this plan. The difference in the $892.00 payment and the $477.00 payment is $415.00. Subtracting $415.00 from the $660.00 shortfall leaves $245.00 per month that the Debtor is unable to pay.

the Debtor estimated as necessary for such expenses, $200.00 is for child support. Approximately $250.00 is for utilities, $100.00 for food and $75.00 for transportation. Clearly this Debtor is not living an extravagant lifestyle. His expenses are lean, but those expenses, when combined with his mortgage payments and arrearage claim payments, exceed his income to a point that this Court is unable to find that the plan as proposed is feasible as required by section 1325(a)(6).

A court's finding that a plan is not feasible must be based on something other than arithmatical calculations. In this case the hardship on the Debtor and the potential hardship to his child if support payments are not made is a major concern. Coupled with the fact that the Debtor will not have any money for ordinary expenses, this Court cannot confirm this plan.

### IV. Conclusion

In reliance on the above, this Court finds that the Objection to Confirmation filed by the Railroad Federal Credit Union is due to be sustained. The plan as proposed does not meet the requirements of 11 U.S.C.

§ 1325(a)(6) and therefore may not be confirmed.

The Debtor has two options. One, he may choose to propose a different plan which includes his home.[17] If he does, that proposal should be made within 10 days of this order, and should demonstrate that his income has increased, that his living expenses have decreased or that he will be able to restructure his mortgage debts. If the Debtor proposes a plan that this Court finds is feasible, the Court will then consider the matters associated with the Credit Union's Motion for Relief from Stay and the Debtor's Complaint to Set Aside Foreclosure and Reinstate Mortgage. Two, if the Debtor chooses to continue with his case without providing for the property, he may propose a plan excluding all current mortgage payments. Such a plan would appear feasible and confirmable.[18]

It is therefore **ORDERED** that the Objection to Confirmation filed by the Railroad Federal Credit Union is SUSTAINED.

**17.** The Debtor testified that his former wife, although living in the subject house, was not contributing money to help defray ordinary expenses or long term debt. The living arrangement that the two have devised seems to be beneficial to both. If the Debtor's former wife is willing to assist the Debtor with expenses and the possibility of such assistance is reliable, the Debtor may include such assistance promise in a new plan proposal. This Court is aware that the Court of Appeals for the Eleventh Circuit recognizes that Chapter 13 of the Bankruptcy Code was expanded to allow Debtors to save their homes. In *In re Hoggle*, 12 F.3d 1008 (11th Cir.1994), Judge R. Lanier Anderson, writing for the court said:

> Chapter 13's overall policy is to facilitate adjustments of the debts of individuals with regular income through flexible repayment plans funded primarily from future income. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 118 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 141 (1978) U.S.Code Cong. & Admin.News 1978, p. 5787. The flexibility permitted in the formulation of Chapter 13 plans represents a central element in the implementation of the Congressional goal to encourage expanded use of Chapter 13. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 117–18 (1977). A main area of expansion was the Code's recognition of the desire of homeowners to save

> their homes through Chapter 13. Under prior law, a Chapter XIII plan could not provide protection to the debtor's home. As a result, courts evolved a solution, granting injunctions against foreclosure on mortgages during the pendency of Chapter XIII cases where foreclosure would defeat the purposes of the plan, and allowing debtors to cure defaults on their mortgages while maintaining current payments. See *In re Garrett*, 203 F.Supp. 459 (N.D.Ala.1962). Section 1322(b)(5) was intended to codify the practice under which foreclosure was enjoined during the pendency of a Chapter XIII, with the debtor given a reasonable time to cure defaults. 5 Collier on Bankruptcy 1322.09 at 1322–25 (15th Ed.1933). Accordingly, permitting cure of postconfirmation defaults best accords with Congressional intent to permit homeowners to utilize its flexible provisions for debt relief without sacrificing their homes.

*Id.* at 1010. The Debtor must still prove however that he has an interest in the home that he is attempting to save.

**18.** Had the Court considered the property interest issue first and found no interest, the second option would have been the only option. If the Court had found that there was an interest, both options would then exist, as they do now.